Good morning, ladies and gentlemen. Our first case for argument this morning is Patriotic Veterans against Indiana by and through Zeller. Mr. Cantley. Good morning, your honor, and may it please the court. Indiana's auto dialer statute restricts the use of automated dialing machines in most circumstances. This case raises the constitutionality of the application of that restriction to political speech. The Indiana automatic dialer statute allows speech in the context of employer-employee relationship. It allows speech from schools to parents and students, and it allows speech between commercial entities with people they have a relationship with. What it does not allow is a political advocacy group like Patriotic Veterans or a political party to use the same technology and make the same type of calls. It doesn't allow any calls to strangers so far as I can see. Isn't that the critical point? No one can call a stranger with a robocall. I don't think the statute can quite be read that way, your honor. What strangers can be called? In the context of the, particularly in the context of the commercial relationship, many people would consider a debt collector calling, for instance, a stranger calling. Would consider what? A debt collector who would, as parties agree in the briefing, the debt collector would be able to call, including somebody who is a third, fourth, fifth transferee of that debt. That was somebody in colloquial terms would be called a stranger. But it stems from a consensual relation. I don't believe so, your honor. You don't believe that a commercial transaction is a consensual relation? I don't believe that the statute regulates the consent or the relationship between us. What it regulates and what the statute says on its face is it regulates messages. In fact, that's the actual word used in section 5 of the Indiana Auto Dialer statute, the one that has the prohibition we're talking about. We regulate messages. Much of your case seems to hinge on the fact that the statute is content-based, given the three enumerated exemptions. And we said in the prior appeal that these exemptions were based on implied consent. Are you saying we were wrong in that understanding? I, I think that understanding came up in a very particular context in, in as far as whether the statute, for preemption purposes, created a prohibition, which the court found it did in fact create a prohibition on, on calls, or there was a, a regulation of calls. And then, your honor, the consent notion came up in the context of that specific context. Now, if we remove that and we're now looking at the First Amendment, we're talking about what speech can happen within those relationships. So, whether or not the first opinion found that there's a relationship aspect between the three exemptions or not, what's really being regulated is the speech that happens within those relationships. And so, the state gives us a great example of this. Talking about the notion of, of the commercial entity exception, the state tells us, look, a political party has, can be conceived of as a commercial entity. And in that context, the, this political party could make automated dialed calls without a live operator to its members to remind them that they have a volunteer obligation or that some up, events have come up. And I take it that patriotic veterans can make calls to its members on that same rationale. That, the state's never conceded that, your honor. So we, we don't. I'm not interested in what the state conceded. You were, you were articulating a rationale under which political parties could make calls to their members. And my question was, couldn't patriotic veterans make calls to its members on the same rationale? When we have made calls to members, the state points out that there was one call that's been made, apparently and inadvertently, and that was a violation of the statute. So I don't believe that the statute would allow for that. We don't, we don't conceive of ourselves as a commercial entity, for one thing. We conceive of ourselves as a political advocacy group that's trying to raise matters of political concern to our members. I think a lot of people who find themselves within the ambit of would not think that they've consented to having a debt collector call them. The statute has an independent provision allowing for consent. And it says that if there's consent, you can make automated dial calls. That provision would have little meaning if, at the same time, the other exceptions to the statute allowed, were, were deemed their own form of consent. Now that's an express consent exception. The other three are implied consent exceptions. And the second one is not exclusively commercial. It's an implied consent for personal relationships, such as member-to-member communications between political organizations. I, I don't. Or other, you know, issue advocacy organizations can communicate with their members this way. It's certainly not been applied that way, Your Honor. We have in the record, at page 38 and 39, the statement from the Attorney General himself warning the political parties after the, this court held in the National Coalition case that there was a political exception for the states do not call this. The state at that point shifted gears, sent a letter to the political parties and said, do not make robocalls to your members or to the public at large because those are covered by the automated dialer statute. So I think the commercial exception is, is limited to commercial relationships. To I, I want to go back for a minute, if I might. Because looking at the first enumerated exception as an example, okay? It seems to me that the content of a robocall from a school to parents, students, or employees could be on, you know, it could be on any number of topics from, say, a school closure due to bad weather or to an upcoming bond vote. How is that exempt, exemption content based in your view? It, it's topic based. It's things dealing with the school parent, teacher, student relationship. So it's content, it's, it's, we have to look at the Reid case, which is really our touchstone for what's content based. And Reid expanded that definition beyond things that expressly targeted political speeds and beyond viewpoint discrimination to say that topic discrimination is, is discrimination and topic censorship is topic censorship. So to the extent the ADMS allows messages, its own word, to, on matters of concerns to schools, it's preferring that topic over other topics that the ADMS would not allow automated calls, even in a context where there's an existing relationship. Like, for instance, Patriotic Veterans and its members of the Sierra Club and its members or the Republican or Democrat parties and their members. There's obviously somebody who joins a political party has a larger sense of consent and a larger relationship than somebody who might have with their, with their debt collector. You take an active step to be a member of a political group, a member of an advocacy group, or a civic group. That's a type of consent and within that relationship, you would expect to be able to have a dialogue with those members. And those topics are out of bounds under the automatic dialogue statute. Now, when I look at that third example, okay, that third exemption rather, or communicating work schedules to employees, that looks closer to a content based exemption to me. But should the communication of a work schedule be understood as more of a verbal act than as an expression of an idea for purposes of determining whether it's content based? It's certainly a topic limitation, which is really the key question you have to address. It limits the communication between an employer and employee to one specific topic, the work schedules. And the reading of the statute and as it's applied, is that these, all three categories, the consent given isn't on any topic. It's on topics that relate to the relationship between the speaker and the listener. And so the commercial entity exception allows speech about what that commercial relationship is. A commercial entity couldn't engage in political speech because that doesn't go to the commercial relationship between the two. Same thing with the schools. The relationship is what the state's not regulating. It's regulating the message that the entity delivers to the listener. And in fact, if this was a... If we view that third exemption and that third exemption alone as being content based, then wouldn't it be appropriate for us to sever that one exemption? If? My position on that would be, Your Honor, first and foremost, that the notion of it's an affirmative... Well, I'm pretty... At least it's to the state. But I don't believe that's the case. Because again, you have one topic that would be placed above the political speech, even if it's something dealing with work schedules. You still have the same core problem, that the statute places that type of speech on that topic on a higher plane than political speech. And I think Reid's really instructive on this, because the Reid ordinance, the opinion does a pretty good job. Counsel, I'm not sure how you would even have standing to complain about the scope of the third exemption. I can understand how an employer who wanted to convey information other than a work schedule would have standing, but how does patriotic veterans, which wants to call strangers rather than anybody in a consensual relationship? Two responses to that, Your Honor. Patriotic veterans has members in Indiana it wants to reach to motivate, to get them out to the polls. You don't want to call people and convey work schedules to them. No. Right? It's a basic rule that you can't assert third parties' rights. Employers might actually have rights. No, absolutely, Your Honor. I'm sorry, I wanted to answer the first part first, which is that my even accepting that the statute makes that distinction. As far as the standing part of the question. If it's calling people other than strangers, sub B1 says if a person is actually consented, then robocalls are fine. So if you get people actually to consent, there's no trouble. The trouble arises with cold calls to strangers, people who haven't consented. Anyway, back to my question. But I think that's how you would have standing to complain about the limitation of sub A3. I, Your Honor, I don't think a stranger is someone who hasn't signed a formal written consent. But as far as the standing question, Your Honor, look, the difference is that an employer in that position and the topic of that employer's speech is put in a higher position than our client, who isn't given the benefit of being able to use the auto dialer. So any topic based decision like that is placing the topic of that speech on a higher plane than ours, which is exactly what Reed told us the state could not do. And in fact, the statute, Your Honor. I have a very difficult time because it seems to me that the auto dialer provision draws distinctions based not on the content of any topic discussed or message conveyed, but rather on the relationship between the caller and the recipient that's based on an implied consent, sort of, you know, bottom line. Do you really think Indiana citizens would view a less restrictive form of restraint on robo calls as adequate to protect their residential privacy? Do you really think so? I think a total ban is the most restrictive, and we're very close to that here, where we can't make automated calls. We have to use a live operator, unlike any of the exceptions. There are obviously, if you, and both courts that have addressed this post-Reed, have had little trouble finding that a ban of this sort, a prohibition or restriction of this sort, is not narrowly tailored. The way to limit excessive calls, we have this notion in the state's position that we could make hundreds of thousands of calls. Well, the way to attack that problem is to attack that problem, not totally ban the calls, but put a cap on the number of calls, put a daytime restriction on the number of calls. If the problem is unwanted calls, have a do-not-call list. The state lauds its do-not-call list, and in fact tells us that 80% of the calls that existed prior to that do-not-call list went away. And so what we're really talking about here, as far as the state interest, is whatever is left over after the do-not-call list went into effect, because that obviously materially reduces the state's interest is limited. So you're talking about Polly in the Fourth Circuit and Gresham? Gresham, your honor. I take it. From the Eastern District of Arkansas. Yeah, those statutes, in those cases, expressly banned robocalls that were connected with political campaigns, and were, seems to me, properly understood as singling out a particular category of speech, political campaign speech for negative treatment, making them a lot closer to read. And here, by contrast, the statute, as I understand it, is not singling out particular types of speech, but rather is giving a differential treatment to particular speakers, in the telephone subscriber, who has impliedly consented to calls from those speakers. So that's where I'm having, you know, a big problem. If I may, your honor, I think we've gone right to the core of Reed. Reed said that you don't have to have that kind of targeting of speech. What you have to have is a differentiation between topics. So the idea that our statute in Indiana doesn't have an express mention of political speech, as compared to South Carolina's or Arkansas's, is a distinction without difference after Reed. What matters is whether the topics being discussed are being treated differently. And that goes back to your idea that there is a consent factor here, and my point on that would be, your honor put it just perfectly, some speakers are getting the ability, based on this idea of consent, but they're only speaking on certain topics. School topics, commercial topics, a very limited amount of employer-employee speech. They don't get to talk about political speech or whatever they want. So it's limited speakers, limited topics. That's what Reed tells us you cannot do. I see my time's up. I save the rest of my time for Richard. Thank you, your honor. May it please the court. I suppose I'll jump right in on the question about the exemption. I think your honor had it exactly right, that there's lack of third-party standing to call into question whatever limits there are on the employer-employee communication and the permissibility of using robocalls there. You know, you can only do third-party standing in the First Amendment where there's substantial overbreadth, and there's been  theory with regard to that. So I think that that's not something the court can can get into. With respect to Haley and Gresham, I think exactly there, those targeted political speech, here there's no such targeting. The Supreme Court's been quite clear that you can have a law that can validly apply to political speech as long as it doesn't target political speech, and that's exactly what we have. With respect to the do not call list, I think it's important to bear in mind that the way things are set up in Indiana, political telemarketers have the most leeway. You've got everybody else that, regardless of auto dialers, can't call people on the do not call list. Patriotic veterans can call people on the do not call list. So if we were just to sweep all of this within the do not call scheme, they would be under a much more restrictive scenario. Now could enumerated exceptions be in the sense that by exempting certain categories of speakers, the statute impliedly favors some categories of speech over others? There may be scenarios where that's possible, but I think the court got it right early in the first go-around of this case, where I looked at those exceptions and reasonably inferred that they're based on that relationship, and there's nothing there that implies some preference for any kind of message. It's simply an acknowledgment that these are the kinds of things that people would reasonably consent to, and that's the theory that supports them, not some preference for any kind of message. So I don't think we have, whatever it might take to render something that seems not content-based into an implied content-based exception, whatever that might be, I don't think we have it here. And what about the fact that the third exemption, which I'm obsessing about, is for the communication of work schedules to employees? Should that exemption be understood as expressly favoring a particular type or topic of speech and... Well, first of all, as it pertains to patriotic veterans, the exception has to do with employers and employees, and I think at that level we can examine it and say this is not content-based. Now, within that, then you have a narrowing of the exception for work schedules, and to the extent that it's not content-based, then you have  the extent that there might be employers out there who want to use auto-dialers to communicate something other than work schedules, perhaps they could raise a challenge to that, and then we'd have to examine whether we've got what it takes to justify that. But that kind of limitation is not something that patriotic veterans is in a position to challenge and to raise here. Yeah. Okay. Well, if we were to view that third exemption as being content-based, could we sever that provision from the rest of the statute? We haven't briefed it, I think, from a practical standpoint. The state wants to respect what the legislature enacted here, and yet I think to retain the protection that the rest of the statute provides, even without that particular exception, would probably be better. But I would think that we would want to have more thoughtful briefing on that before we came to any conclusion. I think the better course is simply to acknowledge that there just isn't grounds to get into that in this case and save that for another. Is the third exemption even necessary, given that the second exemption covers entities with whom a subscriber has a current business relationship? That's an excellent point, Your Honor. Perhaps we could fit the same kinds of calls within that. Thank you, Mr. Fisher. If there are no further questions, I'll conclude. Thank you. Thank you, Mr. Fisher. Anything further, Mr. Cranley? Yes, Your Honor. I thank the Court for its time and attention to this matter today. I do want to address a few things, particularly, obviously, the consent issue or the relationship issue is paramount, and I want to make a couple of responses. One, I think there's two levels to the auto-dialer statute we need to look at in terms of that issue. One is that the statute first picks the types of relationships and thus the types of speech within those relationships that come within the terms of the exceptions to the automatic calling statute. It picks commercial relationships. It picks employee relationships. It picks school relationships. But it doesn't just say you can do whatever you want. There's a blanket consent. And what it ignores is that there are other relationships, including political relationships, where the same notion of implied consent would exist, even if that is what the statute's doing. And within those relationships, political speech occurs. The state really lays this out in its brief. It's page 25 of its Applebee's brief, where it says if we consider patriotic veterans or a political party, they can go ahead and make business-related calls. They cannot make political-related calls. That's topic discrimination you have to read. Well, arguments about over-inclusiveness and under-inclusiveness usually relate to the effect of the prohibition, not the effect of exemptions. Well, in this one we have an unusual statute the way it's written, and it helps illuminate the nature of the topic of discrimination. That's why we need to look at who is allowed in to the automated dialing world and who's excluded from the automated dialing world. The people who are allowed in are people who have commercial relationships and who want to talk about those commercial relationships, or schools who want to talk about their schools. And just leaving aside the third one for a moment, in those contexts, the speech is allowed because of that relationship. It's given a favorable relationship, and thus the speech within that relationship is given an exalted position. Political speech is nowhere to be found. Even within those relationships, you can't engage in political speech. It's barred under the statute. So it's picking and choosing which message, and I certainly think it's reasonable to say, and it's in the record, that the political parties themselves believe that their members consent to receiving these types of messages. When this was announced after the National Coalition case, the disenforcement program was going to go into place, the Attorney General sent a letter, and at appendix page 29 is the comments of the Libertarian Party Chair of the state of Indiana, who said very clearly, if this is about consent, my people want to receive these messages, and we're being told we can't do that. Right, but you're not seeking a remedy that would permit member-to-member robocalling among political organizations. I think there's two things that are barred that my client cares about. That's the first one. We can't talk to our own members. Why not? Sub B1 says a caller may use a robocall if the subscriber has requested, consented, permitted, or authorized receipt of the message. So every single member... So you just make a statement on your website that by continuing membership in Patriotic Veterans, you authorize this. It's the same way credit card companies change their terms, change their interest rates. The state's told us that we can't do that. The state can tell you anything, but the statute says what it says. And at that point, we're faced with the potential of enforcement, which is why we're challenging the statute. Well, too bad. Most people don't like laws because somebody may sue them. But if the statute says the subscriber can consent, then I don't know why you don't do exactly what a credit card company does when it wants to change the terms on which it makes its credit. And, of course, Your Honor, our position would be that we shouldn't have to, given that we have the same type of... Yeah, that's the argument you're making in this litigation, that you shouldn't have to. It doesn't matter whether anybody is your member or whether anybody is consented. But that just brings us back to the way the argument began with the question whether the exemptions in this statute deal with anything other than existing relationships, and you want to call people with whom you don't have an existing relationship. My red light has gone off, Your Honor, but may I answer your question briefly? Fifteen seconds. Thank you, Your Honor. It goes to the core that those three exceptions have a nexus of relationship. It is not the only thing occurring within those three exceptions. They make a difference based on the speech that occurs within those relationships. And I hope I didn't go over my words. Thank you, counsel. Thank you, Your Honor. The case is taken under advisement.